### Adam Eckart et al. Appellees, v. City of Belleville, Appellant.

Opinion filed March 9, 1938.

L. N. NICK PERRIN, JR., of Belleville, for appellant.

PHILIP G. LISTEMAN, of East St. Louis, and J. FRED GILSTER, of Chester, for appellees; JOHN SPRIGG GILSTER, of Chester, of counsel.

MR. PRESIDING JUSTICE STONE delivered the opinion of the court.

These consolidated cases were tried before the court without a jury upon the complaints filed by the plaintiffs and the answers and additional answers filed by the defendant. The plaintiffs are farmers, cultivating about 1,750 acres of valuable farm land lying between three and fifteen miles south of Belleville, bordering Richland Creek. Their complaints prayed for an injunction against the defendant prohibiting it from further polluting said Richland Creek, a natural water-

course extending from a point north of the city of Belleville, Illinois, thence south for a distance of approximately 20 miles to its mouth at the Okaw River, by emptying its raw, contaminated and untreated sewage therein. Each of the plaintiffs filed a separate law count, in which he asked for damages on account of the discomfort and inconvenience and expense suffered by him over a period of five years preceding the filing of his suit as a result of the pollution of said creek. After hearing the testimony and examining the briefs submitted by the attorneys for the respective parties, the chancellor rendered a written opinion and entered a decree making special findings of fact and finding that the defendant was committing a public and private nuisance by polluting Richland Creek by discharging therein filthy, raw and contaminated sewage, and enjoining the defendant from further polluting said creek, and prohibiting it from emptying sewage therein in a raw, untreated and contaminated condition. The decree provided that the injunction should take effect 18 months from the date thereof, and contained appropriate orders for an extension of time in the event the defendant showed good faith in an effort to abate the nuisance. The decree also awarded money damages in the sum of $1,000 to each of the plaintiffs with the exception of the plaintiff, Charles Probst, who was awarded the sum of $1,400.

The testimony shows that prior to the pollution of Richland Creek by the defendant it was a clear water, natural stream that extended from a point some miles north of the city of Belleville through the city and thence south to the Okaw River. It was inhabited by all kinds of animal and fish life and the water of the stream was suitable for consumption of both man and beast. Each of the plaintiffs reside south of the city of Belleville and their lands border the creek on either

side. The homes occupied by the plaintiffs are approximately 1,000 feet from the creek and their farm lands are adjacent to the creek banks. The testimony shows that the city of Belleville is inhabited by approximately 30,000 people, and that the population of said city has increased yearly for more than the last 20 years. Many years ago the defendant constructed two septic tanks that empty into Richland Creek for the purpose of disposing of the sewage of said city. They are known as the Richland Creek tank and the McClintock avenue tank. They are described in the record as tanks Nos. 1 and 2, respectively. The sewage of the city is carried into these tanks by a city sewer system and in intercepter. The sewage is then passed from the tanks directly into Richland Creek. In 1933, Mr. W. H. Wisely, an assistant sanitary engineer connected with the department of public health of the State of Illinois, was sent by that department to Belleville to examine the septic tanks and the polluted condition of Richland Creek. He found both tanks overloaded. Tank No. 1 was loaded with the sewage of about 14,000 people and was loaded more than eight times its capacity; and tank No. 2 was 100 per cent overloaded. At that time he examined Richland Creek for a distance of 20 miles from the city of Belleville, and found that near tank No. 1 the flow of the stream was entirely composed of raw sewage. North of the city there was no visible evidence that the creek was polluted. The stream contained a soapy scum on the surface of the water and teemed with sludge deposits with tubifex worms, fungus growth and vile odors. About three miles south of tank No. 1 the water was in the same condition and contained little dissolved oxygen. As far as 15 or 17 miles down the stream the water was turbid with yellow scum; sludge deposits gave off vile, foul odors and had a dissolved oxygen saturation of

only 35 per cent. He testified that from the septic tank No. 1 to Smithton, a distance of more than 15 miles, there was no animal of fish life about the creek; that fish could not live in the water because of the small amount of dissolved oxygen, caused by the extreme pollution of the stream.

In May, 1936, he again examined the tanks and found that they were in the same condition as that of his previous examination in 1933. The condition of the stream south of Belleville was worse than it was in 1933, and the stream showed more evidence of gross pollution. The tank effluence was putrescible. He found a leak in the intercepter where 150,000 gallons of raw sewage were being emptied into Richland Creek daily. There was no dissolved oxygen in the stream for a distance of 25 miles south of tank No. 1, and in that distance only one live fish was seen. Properly loaded and operated, the tank should remove about 25 per cent of the suspended matters and about 15 to 20 per cent of the oxygen-consuming matter. In August, 1936, he made another examination of the condition of the septic tanks and the creek. This examination revealed that tank No. 1 was dissolving only 2.3 per cent of oxygen consuming matter in the sewage and only 8.3 per cent of the suspended matter was being removed.

In November of the same year he made another inspection and found that a quarter of a mile south of septic tank No. 1, the creek was full of suspended matter, heavy sludge deposits and foul odors and that for a distance of approximately 20 miles south of the tank, the water in the creek was dark and the stream was lined with tubifex worms. Tubifex worms live only in polluted streams. Samples of the water taken from the creek on this inspection were present and exhibited at the trial of this case.

Much contradictory testimony appears in this record, and plaintiffs and their witnesses testifying to the

above foregoing conditions and the terrible effects thereof on their homes and their comforts, and also to the effect upon their live-stock,—the defendant's witnesses denying that such conditions exist.

The defendant city has brought the record here on appeal, assigning many errors, three only of which are argued. The first is that the finding and judgment of the court is against the manifest weight of the evidence. A reference to this record at once meets this objection. The evidence shows not only that the court was warranted in the action that it took, but that the conditions existing in the premises described are most shocking. The least that can be said is that the testimony raises a question of fact for the court who heard the witnesses and saw them testify. A striking incident appeared in this trial as it is described by the trial court; that is, that one of the witnesses for the defendant smelled and drank some of this water in court. The court in its opinion says that this is true, but that this witness did not impress the court either with his intelligence or his integrity. This but illustrates the wisdom of the rule that the tribunal which first hears the facts and hears them from the witnesses themselves is in a better position to judge of the credit due such witnesses than is an appellate tribunal which is only concerned with the record.

The only other assignments argued are the question of a prescriptive right in the city to do what the evidence shows it has done and laches on the part of the plaintiffs. These objections are met by defendant's own citations.

In *Barrington Hills Club v. Barrington*, 357 Ill. 11, it was held that as riparian owners have a right to have a watercourse carry only such volume of water as may be collected by the drainage of the basin in which it flows, a city or village cannot increase or pollute such watercourse by the discharge of sewage therein with-

out compensation, even though it is the only available natural watercourse for such purpose and even though the municipality has a sewage treatment plant of modern design.

In the *Village of Dwight v. Hays,* 150 Ill. 273, it was held: "The right to pollute the waters of a creek by discharging sewage into it, is in the nature of an easement, which could be created only by grant or prescription; and a mere oral consent to such pollution of the stream vested in the village no right not in the power of the party giving the consent, at any time to revoke. Nor will the fact that the village has expended money or incurred liability on the faith of such parole license, present any obstacle to such revocation."

In *City of Bloomington v. Costello,* 65 Ill. App. 407, it was held: "There can be no such right to maintain a nuisance which is of public nature, as the evidence tended to show this was. Besides proof seemed to establish the position that the flow from the sewer has materially increased of late years, and that the obstructions in the stream have also increased, thereby increasing the noxious odors, as well as the tendency to overflow."

There seems to be no doubt from the authorities on this subject and what is said on the doctrine of prescription seems to us to answer the contention of estoppel in the petitioners. The evidence in this case justifies the belief that a new condition was constantly arising. What one might be estopped from doing yesterday does not amount to an estoppel against a different thing which is done today.

As to the subject of damages, the judgments of the court are not excessive in the light of the facts in case. Complaint is made that error was committed in the introduction of evidence as to damages. That might be

true and yet if there is sufficient evidence in the record to justify the finding, a judgment would not be reversed because some error entered into the admission of testimony. This case was not heard before a jury; it was heard before the chancellor and the presumption is that he decided the case on the proper evidence and not on the improper.

We are of the opinion that the finding and judgments of the court in these cases are proper and that said judgments should, therefore, be affirmed.

*Judgments affirmed.*